**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (310) 285-5330
Email:  jpafiti@pomlaw.com

Jeremy A. Lieberman
Michele S. Carino
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
Email:  mcarino@pomlaw.com
Email:  ahood@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*
(*Additional Counsel on Signature Page*)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SATYABRATA MAHAPATRA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TRUECAR, INC., SCOTT PAINTER, AND MICHAEL GUTHRIE,<br><br>Defendants. | No. 15-cv-03979-R-PJW<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiffs Fernando Martinez and MacDonald Bowyer ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding TrueCar, Inc. ("TrueCar" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all persons and entities, other than defendants and their affiliates, who purchased the securities of TrueCar from May 16, 2014 to July 23, 2015, inclusive (the "Class Period") and did not sell such shares prior to March 9, 2015.  Plaintiffs seek to pursue remedies against TrueCar and certain of its officers and directors for violations of the federal securities laws under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      TrueCar Inc. is an Internet startup that pitched itself to investors as being on the cusp of disrupting the auto industry. TrueCar claimed that the Company would revolutionize the industry by providing detailed pricing information to customers, and then connecting customers with dealers who would offer guaranteed prices on TrueCar's website – avoiding any haggling over prices. TrueCar would earn money in the form of commissions when its platform facilitated sales.

3.     TrueCar's business, however, had two major problems, neither of which the Company disclosed to investors.

4.     First, TrueCar's dealers did not honor TrueCar's guaranteed prices, frustrating many customers. Multiple former employees of the Company relate that customers repeatedly complained to TrueCar that dealers failed or outright refused to honor the prices for cars as listed on the TrueCar platform.  In some cases, dealers would advertise cars that were not in stock.  In other cases, they would attempt to upsell buyers.  The failure of dealers to honor TrueCar's guarantees, and TrueCar's inability and/or lack of meaningful effort to enforce those guarantees, fundamentally undermined TrueCar's value proposition to consumers and TrueCar's business model.

5.     Second, TrueCar's business model flouted state laws with respect to licensing requirements for automobile brokers and dealers.  According to a former employee, the Company was on notice as early as 2012 that its commission model, described in more detail below, was at odds with Pennsylvania law—specifically, provisions of Pennsylvania law that are substantively similar to applicable law in other states in which TrueCar conducts business, including but not limited to California, the most populous state in the U.S. and the eighth-largest economy in the world.

6.     TrueCar's investors only learned of these fundamental problems with the Company's business model when TrueCar was sued, twice, in the spring of 2015.  First, as a result of TrueCar's false advertisements that the Company offered a guaranteed price to customers, on March 9, 2015, a group representing car dealers filed suit in the United States District Court for the Southern District of New York, accusing TrueCar of unfair business practices by falsely claiming to be able to "guarantee" prices for cars.  This revealed to investors for the first time that TrueCar could not honor its promises to guarantee prices to customers.

7.     On this news, shares of TrueCar fell $0.47, or over 2.7%, to close at

$16.50 on May 10, 2015.

8.     Then, just two months later, on May 20, 2015, a lawsuit was filed against TrueCar in Los Angeles County Superior Court, alleging that TrueCar acted as a dealer and engaged in autobrokering without proper state licensure.  This revealed to investors for the first time that TrueCar's business model was unlawful in California.

9.     On this news, shares of TrueCar fell $1.04, or over 6.9%, to close at $13.99 on May 20, 2015.

10.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), and Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77(o)).

12.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act and Section 22(a) of the Securities Act, 15 U.S.C. §77v(a).

13.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a),   and 28 U.S.C. §1391(b) as a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Lead Plaintiff Fernando Martinez ("Martinez"), as set forth in the Certification submitted in conjunction with his motion for appointment as lead plaintiff (ECF No. 31-2), which is incorporated by reference herein, purchased the securities of TrueCar at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Lead Plaintiff MacDonald Bowyer ("Bowyer"), as set forth in the Certification submitted in conjunction with his motion for appointment as lead plaintiff (ECF No. 31-2), which is incorporated by reference herein, purchased the securities of TrueCar at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant TrueCar is a Delaware company headquartered and operating at 120 Broadway, Suite 200, Santa Monica, California 90401. At all relevant times herein, shares of TrueCar were listed on the NASDAQ.

18.     Defendant Scott Painter, ("Painter") has served at all relevant times as the Company's Chairman and Chief Executive Officer ("CEO").

19.     Defendant Michael Guthrie ("Guthrie") has served at all relevant times as the Company's Chief Financial Officer ("CFO").

20.     Painter and Guthrie are sometimes referred to herein, collectively, as the "Individual Defendants".

## SUBSTANTIVE ALLEGATIONS
### Background

21.     TrueCar was founded in 2005 under the name Zag.com Inc. It is based in Santa Monica, California and its shares trade on the NASDAQ under the ticker symbol "TRUE."

22.     TrueCar operates as an Internet-based broker of new and used cars. The Company operates its platform on the TrueCar Website and TrueCar mobile applications. It also provides customized versions of its platform for marketing

1   partners such as financial institutions, membership-based organizations, and
2   employee buying programs for large enterprises.

3          23.    TrueCar's platform is marketed as a tool to take the haggling and guess
4   work out of car purchases.  On the Company's website or mobile application, a
5   consumer in the market for a car identifies the make and model of a desired car, as
6   well as various options, and receives several pieces of pricing data.  TrueCar's
7   platform then provides consumers with the manufacturer's suggested retail price,
8   along with an "invoice price," which TrueCar defines on its website as the "amount
9   that a manufacturer initially charges the dealer for a vehicle, including designation
10  fees, regional ad fees, and other fees charged to the dealer by the manufacturer."
11  The platform also provides consumers with previous purchase prices that different
12  consumers (not necessarily those who used TrueCar) have paid in prior purchases.
13  Finally, the website provides a TrueCar estimated price (the "TrueCar Estimate").
14  If a customer wishes to proceed to buy the specified car, TrueCar will forward the
15  consumer's information to various car dealerships, each of which has the option of
16  offering, via email, to sell matching cars to the customer.  A dealer's email typically
17  includes the TrueCar Estimate, along with a Guaranteed Savings Certificate that
18  TrueCar promises will provide the customer with "guaranteed savings."  TrueCar's
19  platform then instructs the user to go to that dealer with a copy of the Guaranteed
20  Savings Certificate to get "upfront prices" on their chosen vehicle.

**Undisclosed Problems with TrueCar's Business Model**

21
22          24.    Undisclosed to investors, however, were significant problems with
23  TrueCar's business model.  First, despite its advertisements to the contrary, TrueCar
24  could not "take the haggling out" of car buying because the Company could not
25  offer guaranteed prices to its customers as promised.  Second, TrueCar's touted
26  innovative and disruptive business model was innovative and disruptive, in part,
27  because the Company flagrantly disregarded state automobile broker and dealer
28  licensing requirements, making TrueCar's business model illegal in at least two

states.

**i.     False Advertising: TrueCar's So-Called "Guarantee"**

25.     The purported ability to guarantee prices to buyers is central to TrueCar's sales pitch.  As TrueCar explained to investors in the Company's registration statements:

> We benefit consumers by providing information related to what others have paid for a make and model of car in their area and, where available, estimated prices for that make and model of car, which we refer to as upfront pricing information, from our network of TrueCar Certified Dealers. This upfront pricing information generally includes *guaranteed* savings off MSRP which the consumer may then take to the dealer in the form of a Guaranteed Savings Certificate and apply toward the purchase of the specified make and model of car. We benefit our network of TrueCar Certified Dealers by enabling them to attract these informed, in-market consumers in a cost-effective, accountable manner, which we believe helps them to sell more cars.

26.     In reality, however, ***TrueCar did not and could not guarantee its prices***.  As Former Employee 1 ("FE1"), a manager of Dealer Development for TrueCar from April 2014 to May 2015, explained, some dealers simply refused to honor certificates or would avoid honoring the "guaranteed price" through various machinations.  Likewise, Former Employee 2 ("FE2"), who was a customer service representative from January 2014 to January 2015, stated that the majority of customer complaints arose when customers tried to use their vouchers at a dealership.  After receiving their guaranteed savings certificates via email, a customer would arrive at a dealership only to find that the car for which the customer had a so-called guaranteed price voucher was not available; the dealer would then either offer a similar car, or in other cases refuse to honor the voucher at all.

27.     Dealers would also use bait-and-switch tactics on TrueCar's

customers.  FE2 explained that customers, after using TrueCar's platform to obtain a purportedly guaranteed price for the specific vehicle they wanted, sometimes drove hours to get to a certain dealership that TrueCar's platform indicated had the desired vehicle at a guaranteed price.  Upon arrival, however, the dealers often informed the customers that they did not, in fact, have the car the customers had specified and then tried to upsell the customers to purchase different vehicles with undesired extras, for which the dealership would charge the customers more than the originally guaranteed price.

28.  Nor, when these issues arose, did TrueCar make any real effort to secure the purportedly guaranteed price for its customers or make sure the customers received the specific vehicles they wanted and for which they had been "guaranteed prices".  FE1, who was responsible for managing accounts and providing support to dealers after the dealers had signed up with TrueCar, stated that if TrueCar received complaints about a dealer, the Company would warn the dealer and offer additional training.  In theory, a dealer was subject to removal from TrueCar's platform for multiple violations, but FE1 never removed any of the dealers with whom she[1] dealt.  When customers called the Company to complain, FE2 said "we'd kind of just BS with them."  Therefore, customers who complained to TrueCar that dealers would not honor their commitments did not receive real help from customer service.

29.  Former Employee 3 ("FE3"), a manager of Customer Support in Texas from July 2012 to January 2015, explained that her team dealt daily with complaints from customers who had arrived at dealerships to find that the car their certificate guaranteed a deal on wasn't available. "The certificate was more of a gimmick—if the dealer doesn't have the exact make and model, they won't get that deal on the car." FE3 estimated that customers were able to get the car at the price the certificate

---

[1] All Former Employees are referred to by the female pronoun regardless of gender to preserve anonymity.

guaranteed maybe 10% of the time. "Most of the time it was a bait and switch, they'd switch it to another vehicle, it was a way to get customers to the dealership. The dealer would be like, 'we don't have that vehicle but we have this one for just $10,000 more, but, because you're with TrueCar, we'll give you $1,000 off.'" FE3 was instructed, in these situations, to try to persuade customers that a different car might be a better fit.

30.     Former Employee 4 ("FE4"), an account manager from October 2007 to August 2014, reported that dealerships that used TrueCar's program as stipulated lost business to less scrupulous dealerships that would advertise whatever price was necessary to lure in the customer, and then either switch vehicles or raise prices when the customer arrived.  FE4 also reported that dealers frequently called to complain that prices listed in TrueCar's website were not accurate.

31.     In addition to customer and dealer complaints about TrueCar's advertising formally registered with the Company, numerous complaints about TrueCar were posted in public forums on the Internet at all relevant times.  The following complaints, from both customers and car dealers, provide a representative sample:

- scam
  eight dealers, NONE would sell at TrueCar price. ALL tried to switch me to a more expensive model.  (April 2, 2015, www.reviewopedia.com/truecar-reviews)

- Bait and Switch
  True Car is a joke! It's primary focus is to act as a lead aggregator for car dealerships. . . . The certificates are NOT worth the pixels on your computer screen.  Within 24 hrs of the inquiry the consumer is then blasted; phone calls, emails, and telemarketers from dealers that are just giddy to start negotiating.  Worse yet, each dealer will have a reason for NOT honoring the certificate[.]  (January 24, 2015, www.reviewopedia.com/truecar-reviews)

- Truecar – The price offers were not honored
  Three dealers offered me a F150 2015 4x4 XLT and all three did not honor the price and tried to sell me something else. One tried to slip by me a 2014.
  Prices were at least several thousand more than offered on their certificate. It seems that dealers are using these offers as a bait to get you into dealership, and they do not have the vehicle or aren't going to sell it at the certificate price. . . .
  I have wasted a lot of my time. (April 20, 2015, truecar.pissedconsumer.com/the-price-offers-were-not-honored-20150420624621.html)

- Where's the car??????
  What a scam. There was no car waiting at the dealer. It's just a way to get you in the door of a select group of dealers that paid to join the club. The dealer I went to was only interested in up-selling me on a car that cost 10k more. bait and switch?????? (February 7, 2015, www.reviewopedia.com/truecar-reviews)

- Where do they get their numbers?????
  I WORK for a car dealership and have had several customers show me their "truecar" printouts. When this happens, I go straight to the invoice of the vehicle and show it to them as well as provide any rebates they are eligible for. They are usually about $3,000 UNDER what we can actually sell the vehicles for!!!! This in turn pisses customers off and when they go to the next dealership and get the same thing, they will either come back to me and purchase or they are so sick of the pricing game they purchase from the dealer they are at. I HATE TRUECAR!!!!! I've been selling for a long time and would LOVE to have one of these Truecar idiots come to my dealership!!! I hope more people realize that Truecar DOESN'T SELL CARS!!!! (July 11, 2014, www.reviewopedia.com/truecar-reviews)

- Is the consensus that Truecar is always useless?
  . . . Here are the issues with Truecar (other than their ridiculous fee):

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

-10-

> There is no guarantee that the dealer will not mess with you. They claim to work with "certified dealer", but to be certified your check has to clear. Which means that you can still have damaged cars, pre-installed add-ons that you will have to fight to have removed, "mistakes" in calculations and paperwork, random fees, etc.
> There is also no guarantee that the car you priced out actually exists. (ca. February 1, 2015, https://www.reddit.com/r/askcarsales/comments/2s49ri/is_th e_consensus_that_truecar_is_always_useless/)

32.    While TrueCar acknowledges on its website that Dealers sometimes do not have an exact match for the car that the consumer selected, the Company merely states, vaguely, that "this is not the dealer's fault, but rather a challenge with the way cars and trucks are manufactured and marketed."

### ii.    An Unlawful Business Model: TrueCar's Flouting of State Licensing Requirements

33.    TrueCar's revenue primarily comes from car dealers, in the form of flat fees paid by dealers upon a sale by the dealer, which essentially makes TrueCar a broker for car dealerships. This business model was illegal in states that placed restrictions on and/or imposed licensing requirements with respect to who could act as an automobile broker—and was, in fact, illegal in at least two states.

34.    Former Employee 5 ("FE5"), who worked as an Area Sales Manager for TrueCar in Pennsylvania from May 2013 to April 2014, explained that sometime in or around 2012, TrueCar was required to switch from a commission model to a subscription model in Pennsylvania.  The state, after receiving complaints from dealers, determined that Pennsylvania law prohibited TrueCar from using its standard commission model.

35.    In addition, in 2012, regulators in Virginia determined that TrueCar's affiliated dealers were violating state law by paying fees to TrueCar for leads that

turned into sales. TrueCar temporarily suspended its operations in Nebraska, Oklahoma, and Colorado in 2012 due to regulatory concerns relating to its advertising and business practices.

36.     At all relevant times, TrueCar's business model faced a similar undisclosed problem in California, where state law prohibits the unlicensed operation of dealers or brokers of automobiles.  Regarding auto dealer licensing requirements, Section 285 of the California Vehicle Code ("CVC") provides, in relevant part, that a dealer is a party who:

> For commission, money, or other thing of value, sells, exchanges, buys, or offers for sale, negotiates or attempts to negotiate, a sale or exchange of an interest in, a vehicle subject to registration . . . or induces or attempts to induce any person to buy or exchange an interest in a vehicle and, who receives or expects to receive a commission, money, brokerage fees, profit, or any other thing of value, from either the seller or purchaser of the vehicle.

CVC Section 11700, meanwhile, states, in relevant part, that:  "***No person shall act as a dealer . . . without having first been issued a license***."

37.     As for autobrokering licensing requirements, CVC Section 232.5 defines brokering as:

> an arrangement under which a dealer, for a fee or other consideration, regardless of the form or time of payment, provides or offers to provide the service of arranging, negotiating, assisting, or effectuating the purchase of a new or used motor vehicle, not owned by the dealer, for another or others.

Section 11735, meanwhile, states that "***No dealer shall engage in brokering a retail sales transaction without first paying the fee required by subdivision (d) of Section 9262 and obtaining from the department an autobroker's endorsement to the dealer's license.***"

38.     TrueCar's business model consists, in part, of connecting prospective car buyers to sellers or purported sellers of specific vehicles, generating consumer interest through television, radio, print, and online advertisements promising "guaranteed savings" and avoidance of "negotiating and haggling of price." Further, TrueCar has contractual arrangements with car dealerships in California, under which TrueCar receives a fee, either on a per-car sale or subscription basis.

39.     As such, at all relevant times, TrueCar both acted as a dealer and engaged in brokering as defined by the CVC in California, but did so without obtaining a dealer's license or an autobroker's endorsement.    Consequently, TrueCar's business model was illegal in California at all relevant times.    Moreover, unlike in Pennsylvania, TrueCar cannot restructure its payment methods in order to avoid the strictures of the law because the California statute defines a broker as one who offers the services of arranging the purchase of cars regardless of the form of payment.    Therefore, changing the manner in which TrueCar is paid in California will not skirt California law.    Therefore, TrueCar is unable to do business in California.

### Materially False and Misleading Statements Issued During the Period

40.     The Class Period begins on May 16, 2014, when TrueCar filed a final prospectus (the "Prospectus") on Form 424B4 with the SEC announcing its IPO. The Prospectus was part of a registration statement, filed on Form S-1 with the SEC, and declared effective by the SEC on May 15, 2014 (the "First Registration Statement"). The First Registration Statement was signed by the Individual Defendants. In the Prospectus, the Company stated, in a section titled "Why Consumers choose TrueCar" that:

> We believe consumers choose TrueCar.com and our affinity group marketing partner websites to simplify the car-buying process and to achieve confidence in the price they receive for a car. Our platform provides the following benefits:

> Upfront pricing information.    We access a broad array of transaction data to provide consumers with relevant pricing information on every major make and model of new car sold in the U.S. We also generally provide consumers with an Estimated TrueCar Dealer Price based on data provided by TrueCar Certified Dealers in their area.
>
> Quality of service of our network of TrueCar Certified Dealers. We strive to provide consumers with a superior car-buying experience through our network of TrueCar Certified Dealers. To become a TrueCar Certified Dealer, dealers must agree to adhere to certain conditions, including providing upfront pricing information and guaranteed savings off MSRP, where available.
>
> Price Confidence.    Our users generally receive up to three Guaranteed Savings Certificates, which provide a guaranteed savings off MSRP on the user's specified make and model of car. Our platform allows the user to compare relevant market data for their specified make and model of car with the guaranteed savings from MSRP identified in these certificates. For the six months ended June 30, 2014, TrueCar users paid, on average, nearly $3,200 less than MSRP.

41.    On May 16, 2014, the Company completed its IPO, issuing 7.78 million shares of stock and raising net proceeds of approximately $70 million.

42.    On August 14, 2014, TrueCar filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q). In the Q2 2014 10-Q, the Company reported, in part:

> We benefit consumers by providing information related to what others have paid for a make and model of car in their area and, where available, estimated prices for that make and model of car, which we refer to as upfront pricing information, from our network of TrueCar Certified Dealers. This upfront pricing information generally includes guaranteed savings off MSRP which the consumer may then take to the dealer in the form of a

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

-14-

Guaranteed Savings Certificate and apply toward the purchase of the specified make and model of car. We benefit our network of TrueCar Certified Dealers by enabling them to attract these informed, in‑market consumers in a cost‑effective, accountable manner, which we believe helps them to sell more cars.

43.    On November 12, 2014, TrueCar filed a final prospectus (the "Prospectus") on Form 424B4 with the SEC announcing its public offering of 1,000,000 shares. The Prospectus was part of a registration statement, filed on Form S-1 with the SEC, and declared effective by the SEC on November 10, 2014 (the "Registration Statement"). The Registration Statement was signed by the Individual Defendants. In the Prospectus, the Company reiterated, in identical terms, the following statement:

Why consumers choose TrueCar

We believe consumers choose TrueCar.com and our affinity group marketing partner websites to simplify the car-buying process and to achieve confidence in the price they receive for a car. Our platform provides the following benefits:

Upfront pricing information.    We access a broad array of transaction data to provide consumers with relevant pricing information on every major make and model of new car sold in the U.S. We also generally provide consumers with an Estimated TrueCar Dealer Price based on data provided by TrueCar Certified Dealers in their area.

Quality of service of our network of TrueCar Certified Dealers. We strive to provide consumers with a superior car-buying experience through our network of TrueCar Certified Dealers. To become a TrueCar Certified Dealer, dealers must agree to adhere to certain conditions, including providing upfront pricing information and guaranteed savings off MSRP, where available.

Price Confidence.    Our users generally receive up to three Guaranteed Savings Certificates, which provide a guaranteed savings off MSRP on the user's specified make and model of car. Our platform allows the user to compare relevant market data for their specified make and model of car with the guaranteed savings from MSRP identified in these certificates. For the six

months ended June 30, 2014, TrueCar users paid, on average, nearly $3,200 less than MSRP.

44.     On November 14, 2014, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").

45.     In the Q3 2014 10-Q, the Company stated, in part:

> We benefit consumers by providing information related to what others have paid for a make and model of car in their area and, where available, estimated prices for that make and model of car, which we refer to as upfront pricing information, from our network of TrueCar Certified Dealers. This upfront pricing information generally includes guaranteed savings off MSRP which the consumer may then take to the dealer in the form of a Guaranteed Savings Certificate and apply toward the purchase of the specified make and model of car. We benefit our network of TrueCar Certified Dealers by enabling them to attract these informed, in‑market consumers in a cost‑effective, accountable manner, which we believe helps them to sell more cars.

46.     The statements referenced in ¶¶ 40-45 above were materially false and misleading because Defendants made false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, prospects and performance.

47.     Specifically, during the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (i) dealers listed on TrueCar's platform frequently did not honor the Guaranteed Price Certificates; (ii) as a result, TrueCar did not and/or could not actually guarantee prices for its customers; (iii) TrueCar's business model necessarily entailed acting in the capacity of a dealer and engaging in autobrokering as defined by the CVC; (iv) TrueCar engaged in the foregoing activities in California without proper licensing, in violation of state law; and (v) as a result of the foregoing, TrueCar's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

### i.     The SDNY Complaint

48.     Investors finally learned about the undisclosed fundamental problems with TrueCar's business model in the spring of 2015.  On March 9, 2015, a group of more than 110 car dealers filed a complaint against TrueCar in the United States District Court for the Southern District of New York, claiming that the dealers had been injured by the Company's business practices which violated unfair competition and deceptive trade practice laws (the "SDNY Complaint"). The SDNY Complaint seeks injunctive relief in addition to over $250 million in damages as a result of the alleged diversion of customers from the plaintiffs' dealerships to TrueCar's affiliated dealers. Specifically, the SDNY Complaint alleges, in part, that:

> TrueCar's advertisements falsely claim that consumers using its services can purchase an automobile with no "haggling" and "no negotiation," and that TrueCar benefits consumers by "removing surprises at the dealership." However, TrueCar merely acts as a referral service that provides TrueCar-affiliated automobile dealerships with customer leads and contact information. Contrary to TrueCar's advertising claims, the consumer must negotiate, or "haggle," with TrueCar's affiliated dealers to complete the actual purchase. TrueCar's false advertising unlawfully diverts consumers away from Plaintiffs' automobile dealerships, which results in lost sales and harm to Plaintiffs' goodwill.

> TrueCar's literally false or misleading advertisements deceive consumers into believing that they can purchase an automobile without price negotiations at a "guaranteed" low price by simply logging onto TrueCar's website and printing or downloading a price certificate. In reality, consumers using TrueCar's services must negotiate with the TrueCar-affiliated dealers over price, features, and financing, just as they would need to do with any other non-affiliated dealer. Despite its advertising claims to the contrary, TrueCar does not "remove surprises" at the dealership. Instead, TrueCar's customers will be surprised to learn that, among other discrepancies, the promised vehicle may not be in stock, and may not be available at the advertised price or financing terms. TrueCar's false or misleading advertising includes: (a) false "no-haggle" claims; (b) bait-and-switch

advertising; (c) false factory invoice claims; (d) false financing claims; (e) false transparency claims; and (f) false rebate claims.

TrueCar's advertising is causing serious and irreparable harm to Plaintiffs. It constitutes false advertising in violation of Section 43(a)(1)(B) of the Lanham Act (15 U.S.C. §1125(a)(1)(B)); unfair competition in violation of New York common law; and violation of the New York Deceptive Acts and Practices Act (N.Y. Gen. Bus. Law §§ 349-350) and violation of the comparable unfair competition and deceptive acts and practices laws of the other states in which the advertising is disseminated.

If TrueCar's advertising is not immediately enjoined, Plaintiffs will continue to suffer irreparable harm in the marketplace. Plaintiffs have lost sales and have suffered injury to their goodwill and business reputation as a result of TrueCar's false advertising claims.

…

TrueCar advertises that its customers can utilize TrueCar's services to purchase an automobile without haggling (hereafter, the "No-Haggle Claim"). These advertising claims include statements such as "No negotiation," and "No Surprises." …. TrueCar advertises that "Our TrueCar Certified Dealer Network believes in transparency so you can trust that everything is upfront and out in the open. No hidden costs or surprise fees. Ever." See Exhibit A. TrueCar's website advertises: "So we partnered with like-minded dealers to address the primary stress point - the negotiation and haggling of price."….

The No-Haggle Claim is literally false with respect to TrueCar's services. It necessarily implies that a consumer can simply print or download the Guaranteed Savings Certificate, travel to the TrueCar-affiliated dealer, and drive away with that exact make and model at the quoted price. This is false. A consumer who provides his or her contact information to TrueCar—a necessary step for obtaining the Guaranteed Savings Certificate—will be contacted by multiple TrueCar-affiliated dealers who will instigate negotiations or "haggling" over price.

…

Consumers who provide their contact information in response to prompts from TrueCar's website may request a "Guaranteed Savings Certificate" indicating that a particular make and model is available at a particular price. However, the TrueCar-affiliated

dealers who contact the requesting consumers may not have that particular make and model in their inventory. Instead, in those instances, the TrueCar dealer receiving the referral from TrueCar will attempt to sell the consumer a different vehicle that the dealer has in stock. This constitutes false advertising through a bait-and-switch advertising campaign, wherein consumers are lured to the TrueCar dealer believing that they will be able to purchase the advertised make and model at the advertised price, when in fact, they may be offered a different make and model (hereafter, the "Bait-and-Switch Advertising").

TrueCar's Bait-and-Switch Advertising is literally false with respect to TrueCar's services. It necessarily implies to the consumer that he or she can simply print or download the Guaranteed Savings Certificate, travel to the TrueCar-affiliated dealer, and drive away with that exact make and model at the quoted price. This is false. A consumer who provides his or her contact information to TrueCar—a necessary step for obtaining the Guaranteed Savings Certificate—may learn that the TrueCar dealer does not have that make and model in stock. Consequently, contrary to TrueCar's advertising, the requested vehicle may not be available. TrueCar fails to confirm the availability of the vehicle before advertising it to the consumer though TrueCar's Guaranteed Savings Certificate and related promotions.

49.     On this news, shares of TrueCar fell $0.47, or over 2.7%, to close at $16.50 on March 10, 2015.

ii.     **The LA Complaint**

50.     On May 20, 2015, a lawsuit was filed against TrueCar in Los Angeles County Superior Court, claiming that TrueCar violates various laws that govern car sales in that State including allegations that TrueCar acts as a dealer and broker in car sales transactions but doesn't have proper licensure to act in that capacity (the "LA Complaint"). Specifically, the LA Complaint alleges, in part, that:

This action arises from TrueCar, Inc.'s noncompliance with various sections of the California Vehicle Code ("CVC") pertaining to dealer licensing, brokering, advertising, and disclosure. Through its failure to obtain the necessary dealer's license and autobroker's endorsement, which are required in light of the manner in which TrueCar, Inc. ("TrueCar") conducts business, TrueCar avoids compliance with a host of CVC

sections regulating licensed dealers and autobrokers. Accordingly, TrueCar's methods of doing business: (a) undermine the purpose of the CVC, to wit, consumer protection; (b) effectively allow TrueCar to function as a dealer and autobroker without complying with CVC regulations pertaining to dealers and autobrokers; and (c) place CNCDA members who are licensed dealers doing business or attempting to do business in a situation of potentially unwittingly not complying with the law.

51.   On this news, shares of TrueCar fell $1.04, or over 6.9%, to close at $13.99 on May 20, 2015.

52.   On July 23, 2015, TrueCar issued a press release and filed a Form 8-K with the SEC announcing its preliminary financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 8-K"). For the quarter, the Company reported an expected net loss in the range of $15 to $15.5 million, and reduced its revenue guidance for the full year to $252 to $258 million.

53.   In the Q2 2015 8-K, TrueCar stated that the Company failed to meet its revenue targets because "[q]uarterly units came in below expectations as a result of lower than forecasted traffic growth…," a decline in performance that was due to consumers' discovery that TrueCar's prices were not truly guaranteed.

54.   On this news, shares of TrueCar fell $4.84, or 45.3% over the following two trading days, to close at $5.84 on July 27, 2015.

### iii.   TrueCar Announces Painter's Resignation as CEO

55.   On August 6, 2015, TrueCar announced that Painter would resign as the Company's CEO by the end of the year due to his negative relationships with dealers.

56.   As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

### ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

57.   Painter's knowledge of and recklessness concerning the

misrepresentations and omissions can be inferred from the small size of the company. As of December 31, 2014, TrueCar had 463 employees.

58. Scienter can also be established from the fact that Painter had access to sources of information that would have revealed the fraud. As CEO, Painter was well aware of the numerous complaints that the Company had received from customers and dealers that dealers were not honoring TrueCar's guaranteed prices. In addition to the complaints formally registered with the Company, numerous other complaints were widely disseminated in public forums on the Internet.

59. Painter was also aware of red flags that would have alerted him to the fact that TrueCar violated California's provisions regarding unlicensed brokers and dealers of automobiles. Because TrueCar had to change its business model in Pennsylvania, Painter was aware that TrueCar's business model was potentially unlawful in other states with similar licensing requirements.

60. Scienter can further be inferred from the fact that, on August 6, 2015, after the SDNY Complaint and LA Complaint were filed against TrueCar, the Company announced Painter's resignation as the Company's CEO.

61. Like Painter, Guthrie's scienter can be inferred from the small size of TrueCar. Guthrie's scienter can similarly be inferred from his access to information that would have revealed the fraud—the same customer complaints that Painter had access to, both formally registered with the Company and publicly disseminated on Internet forums. And like Painter, Guthrie, as CFO, would have been aware of the change in business model, as well as revenue model, in Pennsylvania, and therefore would have been aware that TrueCar's business model was potentially unlawful in states with similar licensing requirements.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

62. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired TrueCar securities during the Class Period (the

"Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

63.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the TrueCar Class Period, securities of TrueCar were actively traded on the NASDAQ Global Select Market. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TrueCar or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

64.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

65.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

66.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of TrueCar;

- whether the Individual Defendants caused TrueCar to issue false

and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of TrueCar securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

67. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

68. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- The omissions and misrepresentations were material;

- The Company's stock traded in an efficient market;

- The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

- Plaintiffs and other members of the Class purchased TrueCar common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

69. At all relevant times, the market for TrueCar common stock was efficient for the following reasons, among others:

- As a regulated issuer, TrueCar filed periodic public reports with the

SEC. TrueCar met the requirements for listing, and was actively traded on the NASDAQ, under ticker TRUE;

- As of July 23, 2015, there were 48.98 million shares in TrueCar's public float, and 82.3 million TrueCar shares were outstanding;

- During the Class Period, an average of 5,482,578.8 TrueCar shares were traded weekly, or about 25.3% of TrueCar's publicly traded float and 7.4% of TrueCar's total shares outstanding;

- TrueCar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

- TrueCar was followed by numerous analysts that issued reports about it, including JP Morgan Chase, Morgan Stanley, Oppenheimer & Co., Inc., and RBC Capital Markets.  In total, at least 90 analyst reports were issued regarding TrueCar during the class period.

- New company specific information was rapidly reflected in the Company's stock price.

- More than eighty firms made a market in the Company's stock on the NASDAQ.

70. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

71. Alternatively, neither Lead Plaintiffs nor the Class need prove reliance - either individually or as a class because under the circumstances of this case, which involves a failure to disclose that TrueCar's dealers failed to honor its price guarantees, and that TrueCar's business was illegal in California, as described herein above, positive proof of reliance is not a prerequisite to recovery, pursuant

to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.  As the Supreme Court explained, requiring plaintiffs to describe how they would have behaved had the omitted information been disclosed places an unrealistic burden on plaintiffs.

72.     Alternately, reliance is presumed because Defendants committed a fraud on the regulatory process.  The Fraud on the Regulatory Process presumption of reliance was created by the 9th Circuit in *Arthur Young and Co. v. United States District Ct.*, 549 F. 2d 686 (9th Cir. 1976), cert. denied, 434 U.S. 829 (1977).  In its S-1 filing for its IPO, Defendants omitted to disclose material facts to the Securities & Exchange Commission and NASDAQ in applying for and obtaining permission to sell TrueCar stock publicly in the IPO and having those securities listed for trading on NASDAQ.  TrueCar failed to disclose that TrueCar's dealers failed to honor its price guarantees, and that TrueCar's business was illegal in California. Had it disclosed this information, TrueCar never would have been able to list its securities on the NASDAQ market, sell its securities publicly to investors and complete the initial public offering.    Investors relied on the integrity of the regulatory process when purchasing TrueCar stock.  Defendants' omissions were a fraud on the regulatory process, permitting Plaintiffs a presumption of reliance.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

73.     Plaintiffs repeat and realleges each and every allegation contained above as if fully set forth herein.

74.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

1    thereunder by the SEC.

2         75.   During the Class Period, defendants engaged in a plan, scheme,

3    conspiracy and course of conduct, pursuant to which they knowingly or recklessly

4    engaged in acts, transactions, practices and courses of business which operated as a

5    fraud and deceit upon Plaintiffs and the other members of the Class; made various

6    untrue statements of material facts and omitted to state material facts necessary in

7    order to make the statements made, in light of the circumstances under which they

8    were made, not misleading; and employed devices, schemes and artifices to defraud

9    in connection with the purchase and sale of securities.  Such scheme was intended

10   to, and, throughout the Class Period, did:  (i) deceive the investing public, including

11   Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and

12   maintain the market price of TrueCar securities; and (iii) cause Plaintiffs and other

13   members of the Class to purchase or otherwise acquire TrueCar securities and

14   options at artificially inflated prices.  In furtherance of this unlawful scheme, plan

15   and course of conduct, defendants, and each of them, took the actions set forth

16   herein.

17        76.   Pursuant to the above plan, scheme, conspiracy and course of conduct,

18   each of the defendants participated directly or indirectly in the preparation and/or

19   issuance of the quarterly and annual reports, SEC filings, press releases and other

20   statements and documents described above, including statements made to securities

21   analysts and the media that were designed to influence the market for TrueCar

22   securities.  Such reports, filings, releases and statements were materially false and

23   misleading in that they failed to disclose material adverse information and

24   misrepresented the truth about TrueCar's finances and business prospects.

25        77.   By virtue of their positions at TrueCar, defendants had actual

26   knowledge of the materially false and misleading statements and material omissions

27   alleged herein and intended thereby to deceive Plaintiffs and the other members of

28   the Class, or, in the alternative, defendants acted with reckless disregard for the

truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of TrueCar securities from their personal portfolios.

79.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of TrueCar, the Individual Defendants had knowledge of the details of TrueCar's internal affairs.

80.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of TrueCar.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to TrueCar's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of TrueCar securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning TrueCar's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired TrueCar securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants,

1   and were damaged thereby.

2        81.   During the Class Period, TrueCar securities were traded on an active
3   and efficient market.  Plaintiffs and the other members of the Class, relying on the
4   materially false and misleading statements described herein, which the defendants
5   made, issued or caused to be disseminated, or relying upon the integrity of the
6   market, purchased or otherwise acquired shares of TrueCar securities at prices
7   artificially inflated by defendants' wrongful conduct.  Had Plaintiffs and the other
8   members of the Class known the truth, they would not have purchased or otherwise
9   acquired said securities, or would not have purchased or otherwise acquired them
10  at the inflated prices that were paid.  At the time of the purchases and/or acquisitions
11  by Plaintiffs and the Class, the true value of TrueCar securities was substantially
12  lower than the prices paid by Plaintiffs and the other members of the Class.  The
13  market price of TrueCar securities declined sharply upon public disclosure of the
14  facts alleged herein to the injury of Plaintiffs and Class members.

15       82.   By reason of the conduct alleged herein, defendants knowingly or
16  recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act
17  and Rule 10b-5 promulgated thereunder.

18       83.   As a direct and proximate result of defendants' wrongful conduct,
19  Plaintiffs and the other members of the Class suffered damages in connection with
20  their respective purchases, acquisitions and sales of the Company's securities
21  during the Class Period, upon the disclosure that the Company had been
22  disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

26       84.   Plaintiffs repeat and realleges each and every allegation contained in
27  the foregoing paragraphs as if fully set forth herein.

28       85.   During the Class Period, the Individual Defendants participated in the

operation and management of TrueCar, and conducted and participated, directly and indirectly, in the conduct of TrueCar's business affairs.  Because of their senior positions, they knew the adverse non-public information about TrueCar's misstatement of income and expenses and false financial statements.

86.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to TrueCar's financial condition and results of operations, and to correct promptly any public statements issued by TrueCar which had become materially false or misleading.

87.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which TrueCar disseminated in the marketplace during the Class Period concerning TrueCar's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause TrueCar to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of TrueCar within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TrueCar securities.

88.     Each of the Individual Defendants, therefore, acted as a controlling person of TrueCar.  By reason of their senior management positions and/or being directors of TrueCar, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, TrueCar to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of TrueCar and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

89.     By reason of the above conduct, the Individual Defendants are liable

pursuant to Section 20(a) of the Exchange Act for the violations committed by TrueCar.

## COUNT III

### Violation of Section 11 of the Securities Act
### Against All Defendants

90.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is not based on, does not allege, nor does it sound in, fraud.

91.     This Section 11 claim is asserted against all Defendants

92.     Each Class Member their shares in, pursuant to and/or traceable to the Registration Statements and Prospectuses.  TrueCar is the issuer of the securities through the Registration Statement and Prospectus.

93.     The Individual Defendants are all signatories of the Registration Statement.

94.     Each of the Defendants owed to the purchasers of the stock obtained through the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

95.     None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the challenged statements contained in the Registration Statements and Prospectuses were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

96.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Registration Statements and Prospectuses, which misrepresented or failed to disclose, among

other things, the challenged facts set forth above.  By reason of the conduct alleged herein, each Defendant named in this Count violated and/or controlled a person who violated Section 11 of the Securities Act.

97.    TrueCar is the issuer of the stock sold via the Registration Statement and Prospectus.  As issuer of stock, the Company is strictly liable to Plaintiffs and the Class for the material misstatements and omissions therein.

98.    At the times they purchased their shares of TrueCar, Plaintiffs and members of the Class did so without knowledge of the true facts concerning the misstatements and omissions alleged herein.

99.    This action is brought within one year after discovery of the untrue statements and omissions in the Registration Statement and Prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement and Prospectus.

100.   By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants named in this Count, and each of them, jointly and severally.

## COUNT IV
### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

101.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is not based on, and does not allege, nor does it sound in, fraud.

102.   This claim is asserted against each of the Individual Defendants, each of whom was a control person of TrueCar during the relevant time period.

103.   For the reasons set forth above, TrueCar is liable to the Plaintiffs and the members of the Class who purchased TrueCar common stock in the Offering or pursuant and/or traceable to the Registration Statement and Prospectus based on the untrue statements and omissions of material fact contained in the Registration

Statements and Prospectuses, under §11 of the Securities Act.

104.   The Individual Defendants were control persons of TrueCar by virtue of, among other things, their positions as senior officers, directors and/or controlling shareholders of the Company.  Each was in a position to control and did in fact control TrueCar and the issuance of the false and misleading statements and omissions contained in the Registration Statement and Prospectus.

105.   Neither of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects.  Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

106.   This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statemenst and Prospectuses and within three years after TrueCar common stock was sold to the Class in connection with the Initial Public Offering and the Secondary Offering.

107.   By reason of the misconduct alleged herein, for which TrueCar is primarily liable, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as TrueCar pursuant to Section 15 of the Securities Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees

and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: October 5, 2015
Respectfully submitted,


THE ROSEN LAW FIRM, P.A.


/s/ Laurence Rosen, Esq.

Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email:  lrosen@rosenlegal.com

and

**POMERANTZ  LLP**
Jeremy A. Lieberman
Michele S. Carino
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665
Email:  jalieberman@pomlaw.com
Email:  mcarino@pomlaw.com
Email:  ahood@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (310) 285-5330
E-mail: jpafiti@pomlaw.com

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**POMERANTZ LLP**
Patrick V. Dahlstrom (*Pro Hac Vice*)
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile:  312-377-1184
Email:  pdahlstrom@pomlaw.com

*Co-Lead Counsel for Plaintiffs and Class*